# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**SHARON CHARLES SMITH,**

        **Plaintiff,**

**v.**                                         **Case No:  6:18-cv-0042-RBD-DCI**

**THE AMERICAN NATIONAL RED
CROSS; LIFE AND HEALTH
BENEFITS PLAN OF THE AMERICAN
RED CROSS,**

        **Defendant.**

---

# REPORT AND RECOMMENDATION

    This cause comes before the Court for consideration without oral argument on the following motions:

| | | |
|---|---|---|
| **MOTION:** | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 44)** | |
| **FILED:** | **October 31, 2018** | |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

| | | |
|---|---|---|
| **MOTION:** | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 45)** | |
| **FILED:** | **October 31, 2018** | |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

## I.    BACKGROUND

    This case stems from Defendant's decision to discontinue Plaintiff's long term disability ("LTD") benefits.  Plaintiff claims that she is entitled to LTD benefits and filed this action to

recover those benefits.  Doc. 1.  The parties have each moved for summary judgment.  Docs. 44, 45.  Upon review, the undersigned respectfully recommends that Defendant is entitled to summary judgment.

**a.  The Plan**

Plaintiff worked as a "Project Management Specialist" for The American National Red Cross ("Red Cross") in 2004. She participated in a LTD benefits plan (the "Plan") that is funded by Red Cross. Doc. 44 at 1; Doc. 45, at 1.  Red Cross delegated claims administration duties to Liberty on January 1, 2017. Doc. 45 Ex. A, at 48; 52. The Plan provides, in relevant part, as follows:

Total Disability

You are deemed to be totally disabled while either of the following applies to you:

- In the first 24 months of a period of total disability: You are not able, solely because of injury or disease, to work at your own occupation.

- After the first 24 months of a period of total disability: You are not able, solely because of injury or disease, to work at any reasonable occupation. (This is any gainful activity for which you are, or may reasonably become, fitted by education, training or experience. It does not include work under an approved rehabilitation program.)

. . .

Period of Total Disability

A period of total disability starts on the first day you are totally disabled. You must be under the care of a physician.

. . .

Your period of total disability ends on the first to occur of:

- The date you are not totally disabled, . . . [or]

- The date you fail to give proof that you are still totally disabled.

Doc. 45 Ex. A, at 68-69.

Plaintiff ceased her employment with Red Cross after she was injured in a motor vehicle accident in October of 2004. Doc. 45, at 1. She became totally disabled as a result of her low back pain and began receiving benefits on April 23, 2005. R. 15, 471-75. Plaintiff received benefits until Liberty determined that she was no longer disabled on April 3, 2017. R. 170-72.

### b.  Plaintiff's Medical History Pre-Termination of Benefits

In April 2005, Dr. Gary Dennis ordered an MRI of Plaintiff, finding "[o]steopenia," "[d]egenerative disk disease at L4-5 and L5-S1," and "[a]nterior displacement of L4 on L5 with no evidence of instability between flexion and extension." Doc. 45 Ex. C, at 1. He then performed a "bilateral medial facetectomy and forminotomy, L4-5 and L5-S1, [and] laminectomy L5." Doc. 45 Ex. D, at 135-138, 171-72. In August 2005, Dr. Dennis ordered another MRI. Doc. 45 Ex. C, at 2-3. He found that Plaintiff suffered "[m]ild diffuse degenerative disease" and a "C5-6 bulge." Doc. 45 Ex. C, at 2-3. Plaintiff began seeing Dr. Carol Stewart in 2006. R. 226-250. Dr. Stewart evaluated Plaintiff and found, among other things, that Plaintiff exhibited "L-5 tenderness" and decreased ambulation. R. 231. She also found that Plaintiff had the ability to perform sedentary work activity, which includes moderate limitation of functional capacity. R. 249.

From 2007 to 2010, Plaintiff continued treating with Dr. Dennis and began treating with Dr. Charles Mosee. Dr. Dennis issued an attending physician statement in which he concluded that Plaintiff was "100% permanently disabled." R. 274. Likewise, Dr. Mosee issued multiple attending physician statements concluding that Plaintiff was "permanently and totally disabled." R. 286, 327, 454. After an MRI, Dr. Mosee found "L5-S1 laminectomy with residual lateral facets and lateral disc bulging causing neural foramina exit narrowing and lateral recess narrowing" with

"[a]dequate canel decompression." Doc. 45 Ex. C, at 4-5. Plaintiff was also awarded Social Security Disability Benefits on April 7, 2009. R. 317-22.

Plaintiff had several tests performed between 2010 and 2015. In April 2011, MRIs of the lumbar and cervical spines revealed "anterior bulging disc at the C5-C6 level," "posterior central bulging disc at the C5-C6 level with bilateral foraminal narrowing and nerve root compression," "[p]aracentral herniated distal left at the L4-L5 level extending into the neuroforamen with crescent of the left L4 nerve root," and "[p]aracentral herniated distal right at the L5-S1 level extending into the neural foramen with compression of the right L5 nerve root and the S1 nerve root in the lateral recess." R. 334-35. At her MRI on September 25, 2013, her MRI showed:

> Marked disc space narrowing at L4-L5 and L5-S1 with degenerative Modic II endplate changes . . . . Laminectomy defects are seen. There is probably right lateral HNP at L5-S1. Mild degenerative anterolisthesis of L4 on L5 (5 mm) without spondylolysis. At L3-L4 there is disc space narrowing with mild annular bulge. There are marked degenerative changes in the facet joints with fluid seen bilaterally right greater than left.

R. 350-51.

On February 6, 2014, Plaintiff underwent a spine standing scoliosis series examination. Impressions from that examination noted "[p]ositive sagittal balance with 26 degrees of pelvic tilt consistent with retroversion" and "13 degrees difference between pelvic incidence and lumbar lordosis." R. 149-50. From October to December 2014, Plaintiff underwent a nerve conduction study, an x-ray of the lumbar spine, an MRI, and CT scan of her lumbar spine at the Deuk Spine Institute. R. 91-145. These tests revealed chronic S1 radiculopathy, scoliosis, spondylolisthesis, severe disc space narrowing, mild anterolisthesis, degenerative changes in the facet joints, and annular bulging. R. 102, 147, 148, 152.

Plaintiff treated with Dr. Raguindin from January to December 2015. Doc. 45 Ex. G. Dr. Raguindin completed an attending physician statement, noting Plaintiff's "lumbar degenerative

disk disease" and "low back pain" with "numbness in [her] legs." He also noted, with respect to

Plaintiff returning to work, that she "needs re-eval from occupational medicine." R. 433.

On April 20, 2016, Plaintiff was admitted to the emergency room with complaints of

"chronic back pain." R. 74. She was discharged and established care with Dr. Ashok Shah on April

29, 2016. R. 195. Plaintiff visited with Dr. Shah three more times through February 2, 2017. R.

188-194. He assessed Plaintiff as having "degenerative joint disease" and "[l]ow back pain." R.

191. During his physical examination of Plaintiff, he assessed her range of motion around her neck

as "within normal limits," as well as her appearance as "normal." He also noted that, as of February

2, 2017, "all medical problems [were] adequetaly [sic] controlled." R. 189.

### c.  Liberty's Review and Denial

On March 6, 2017, Liberty requested medical records from Dr. Shah and Dr. Raguindin.

R. 204-06; 207-09. On that same date, Liberty notified Plaintiff via letter that it was "currently

reviewing eligibility for continued disability benefits, and [was] in need of additional information."

R. 211. They informed Plaintiff that they had "requested medical records to support [Plaintiff's]

claim for disability from Dr. Shah and Dr. Raguindin." R. 211. They also requested that Plaintiff

provide "[o]ffice treatment notes, test results, operative reports, prescription histories, and

treatment plans from March 1, 2016 through the present from Dr. Shah and Dr. Raguindin" to

assist with the review. R. 211. Further, Liberty asked that Plaintiff "have [any other attending

physicians or specialists that they were unaware of] forward all medical records pertinent to

[Plaintiff's] disability within the timeframe" given. R. 211.

In a report dated March 29, 2017, Dr. William Jaffe reviewed medical records from Dr.

Shah and summarized his findings. R. 159-161. He noted:

> The claimant is a 57-year-old female whom we are asked to comment and
> determine if her low back pain is causing any functional impairment and, thus, any

supported restrictions or limitations. Per my phone conversation with Dr. Shah on 3/27/17 at approximately 11 a.m. MST, he states there is no functional impairment and, thus, no restrictions or limitations from an internal medicine perspective. Specifically, when questioned about her back pain, he states this is not causing any functional impairment. Thus, we agree there were no restrictions or limitations.

Per office note by Dr. Shah on 4/29/16, physical examination is noted to be normal. The musculoskeletal is normal. With regards to her low back pain, he states she is on narcotics by the pain clinic and recommends evaluation with neurosurgery. Per office note by Dr. Shah on 7/29/16, with regards to her low back pain, he states she currently is on over-the-counter medications. Physical examination is noted to be normal. Per office note by Dr. Shah on 2/2/17, he states that all of her medical problems are adequately controlled.

R. 160. In reliance on Dr. Jaffe's report, Liberty issued a letter on April 3, 2017, notifying Plaintiff that her LTD benefits were being terminated as of that date. R. 170-72.

Plaintiff appealed Liberty's decision on June 14, 2017 and explained that there was a "misunderstanding" related to Dr. Shah's review of the medical records submitted to Dr. Jaffe. R. 73. With her appeal, she included records from an emergency room visit on April 20, 2016, a questionnaire completed by Plaintiff on April 26, 2016 at Spine, Orthopedics and Rehabilitation, MRI results from the Parrish Medical Center in 2013 and 2014, treating notes from visits with Drs. Patel and Deukmedjian at the Deuk Spine Institute in 2014, and a letter from Dr. Shah, dated May 12, 2017. R. 74-154. The emergency room records and questionnaire note that Plaintiff complained of "chronic pain," primarily in her back and legs. R. 74, 82, 87, 91. Dr. Patel performed a physical examination on December 18, 2014, in which he determined mild to moderate tenderness and spasm in her lumbar spine. R. 95. He also noted decreased range of motion with respect to lumbar flexion, extension, right lateral extension, left lateral extension, right lateral flexion, and left lateral flexion. R. 95. On May 12, 2017, after reviewing the additional records submitted by Plaintiff, Dr. Shah stated "I feel that this patient may not be able to work." R. 154.

On June 28, 2017, Liberty informed Plaintiff that it received her request for a review of its decision to terminate her LTD benefits. R. 72. Plaintiff submitted additional information to Liberty on July 23, 2017, including a letter that details her financial hardships and physical limitations as a result of her condition, as well as notes from S&A Acupuncture that note her low back pain. R. 62-71.

Drs. Neil McPhee and Rafael Lufkowitz performed independent reviews of Plaintiff's claim eligibility based on all of the evidence available to Liberty. R. 29-60. Dr. McPhee issued his report on August 31, 2017. R. 44. Dr. McPhee relied on medical and non-medical records dating back to 2006 in rendering his report. He found that "[h]er labs from 1/25/17 show minimal abnormalities with the exception of high glucose and thalassemia minor" and that, on February 2, 2017, Dr. Shah "commented that all her medical problems are adequately controlled." R. 56. He also relied on a discussion with Dr. Shah on August 28, 2017, in which he and Dr. Shah agreed upon the following:

> We reviewed the claimant's medical history related to her chronic back pain. I concluded that although on 12/17/14 she reported 80% to 95% overall improvement with injections and she does not have focal neurological deficits, her marked spinal degenerative disc and facet joint disease with comorbid obesity support functional impairment from 4/4/17 to the present with restrictions and limitations of sitting frequently with the ability to change positions briefly as needed for comfort, standing/walking occasionally, lifting 20 pounds occasionally and 10 pounds frequently, carrying 10 pounds occasionally, bending/twisting/stooping/squatting/climbing stairs occasionally, and crawling/climbing ladders never.

R. 57. Thus, Dr. McPhee determined:

> There would be no limitation to use of her upper extremities for reaching, handing [sic], fingering, or feeling. Within the restrictions and limitations above the claimant has sustained capacity to maintain full time capacity of 8 hours a day/5 days a week. Of note, she lives independently and since 9/27/11 she has been caring for a child who was 17 months old at that time.

R. 56.

Dr. Lefkowitz issued his report on September 7, 2017. R. 35. His report was "based on review of available records," which included notes from Dr. Stewart in 2006 through Plaintiff's letter in July 2017, as well as the independent reviews performed by Drs. Jaffe and McPhee. R. 36, 37-38. He determined that Plaintiff's conditions of low back pain, neck pain, and morbid obesity contributed to medically supported restrictions and limitations, including: frequent sitting, occasional walking and standing, occasional lifting up to 20 pounds, frequent lifting up to 10 pounds, occasional carrying up to 10 pounds, occasional bending/twisting/stooping/squatting and stair climbing, and no climbing ladders. R. 35-36. Additionally, Dr. Shah agreed with Dr. Lefkowitz's summary of their discussion that occurred on September 8, 2017:

> As we discussed, I called to clarify if there was any additional functional impairments due to [Plaintiff's] internal medicine diagnoses of anemia, peripheral artery disease, diabetes, and hypertension. As [Plaintiff's] physician, you described her anemia and peripheral artery disease as mild, her diabetes and hypertension as under control, and noted that she has a diagnosis of knee arthritis in addition to her low back pain. Although she ambulates with a cane, you noted that she arrives independently to appointments. Regarding her obesity, you noted the treatment plan for the obesity at this time includes dietary restriction. In your opinion, her functional impairments are due to her low back pain and knee arthritis, with substantial contribution of obesity to her conditions. You did not wish to provide an opinion as to whether or not she can work for 8 hours a day/5 days per week within the recommended restrictions and limitations you discussed previously with Dr. McPhee (Liberty Mutual physician consultant). Regarding prognosis and possible functional improvement, you mentioned that it would be useful if you could first review the MRI report from 4/2017 discussed by Dr. Patel in a recent treatment note.

R. 23.

On September 8, 2017, Nicole Hall, Vocational Case Manager, performed a Transferable Skills Analysis using the restrictions and limitations identified by the reviewing physicians. R. 24-26. In addition to the restrictions and limitations identified, Ms. Hall considered Plaintiff's education and work history while determining her transferable skills and potential occupations. R.

24-26. She determined that, in addition to other occupations, Plaintiff was able to perform her "own" occupation of "Information Technology Project Manager." R. 26-27.

On September 21, 2017, after the reviewing physicians issued their reports and the vocational expert issued her findings, Liberty denied Plaintiff's appeal of Liberty's initial determination. Liberty relied on the reviewing physicians and vocational expert in determining that Plaintiff did not present:

> [E]xam findings, diagnostic test results or other forms of medical documentation supporting [her] symptoms remained of such severity, frequency and duration that they resulted in restrictions or limitations rendering [her] unable to perform the duties of the occupations identified as being with in [her] functional capacity and vocational skills after that date.

R. 20.

### d.  Post-Denial Medical Record

Plaintiff began visiting with Dr. Anthony Allotta in December 2017 for her cervical and right shoulder pain. Doc. 45 Ex. I, at 10. An x-ray of the cervical spine revealed "[d]egenerative disc and joint disease most pronounced at the C4-5 and C5-6 levels with large anterior spurs." Doc. 45 Ex. I, at 13. An MRI of the cervical spine, performed on February 5, 2018, showed "degenerative disc disease and spondylosis at C4-C5 and C5-C6 with resultant central canal stenosis," as well as "severe bilateral foraminal stenosis at C5-C6." Doc. 45 Ex. I, at 17-18.

On August 7, 2018, Plaintiff submitted to a functional capacity evaluation ("FCE"). Doc. 45 Ex. J, at 1-27. The evaluation determined that Plaintiff "does not meet any physical demand level due to a poor tolerance with sitting." Doc. 45 Ex. J, at 1. Further, the restrictions and limitations identified included: "Variable tolerance of extended standing/walking ranging 5-15 min intervals at one time; sitting up to 120 min intervals at one time"; "Limited repetitive reaching with R>L LUE – unable to reach above the shoulder with R UE only"; "Limited repetitive and/or

sustained firm grasping bilaterally"; "Limited bending/stooping – modified with arm support with reach to 15-21" from floor"; "Unable to squat/crouch, kneel, crawl, stair or ladder climb"; "Limited balance – avoid uneven and/or slippery surfaces"; "Up to 5# lifting at waist level only; up to 3# carrying <50ft"; "Up to 10# pushing only – unable to pull"; "Unable to lift below the waist or above the shoulder (2-handed)." Doc. 45 Ex. J, at 2-3.

## II.    STANDARDS

### a.  Summary Judgment

Courts in this district "have recognized the 'incongruity between the summary judgment standard set forth in Federal Rule of Civil Procedure 56 and the ERISA standard of review.'" *Foster v. Hartford Life and Accident Ins. Co.*, 2010 WL 11504337, at *9 (S.D. Fla. Sept. 7, 2010) (quoting *Cook v. Standard Ins. Co.*, 2010 WL 807443 (M.D. Fla. Mar. 4, 2010)); *Hunley v. Hartford Life and Accident Ins. Co.*, 712 F. Supp. 2d 1271, 1279 (M.D. Fla. April 26, 2010) ("This Court and other courts in this district have recognized that the typical standard of review for summary judgment motions does not apply in ERISA actions."). In the context of ERISA, "claims are construed as a Motion for Final Judgment since the court sits in more of an appellate capacity." *Foster*, 2010 WL at *9 (citing *Providence v. Hartford Life and Acc. Ins. Co.*, 357 F. Supp. 2d 1341, 1342 n. 1 (M.D. Fla. Jan. 12, 2005)); *Phillips v. Metro Life. Ins. Co.*, 2008 WL 899222 at *2 (M.D. Fla. Mar. 31, 2008).

### b.  ERISA Standard of Review

Review of Red Cross's benefits decisions is governed by 29 U.S.C. § 1132(a)(1)(B). Plaintiff has the burden to prove her entitlement to benefits under the Policy. *See Wilson v. Walgreen Income Protection Plan for Pharmacists & Registered Nurses, Walgreen Co.*, 942 F. Supp. 2d 1213, 1247 (M.D. Fla. 2013). The ERISA statute "does not set out the appropriate

standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989). The Eleventh Circuit therefore established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions based on guidance from the Supreme Court in *Firestone* and *Metro. Life Ins. Co. v. Glenn*, 54 U.S. 105 (2008).  In *Firestone Tire & Rubber Co. v. Bruch*, the Supreme Court held "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989). In reviewing a plan administrator's benefits decision, the Court must do the following:

> In step one, a court must determine which standard to apply in reviewing the claims administrator's benefits decision. *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 912 (11th Cir. 1997) . . . . If the court finds that the documents do not grant the administrator discretion, it applies *de novo* review to the administrator's benefits determination and does not proceed to the remaining steps. *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956-57; *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997). "If the court finds that the documents grant the claims administrator discretion, then at a minimum, the court applies arbitrary and capricious review and possibly heightened arbitrary and capricious review" and proceeds to the second step. *HCA*, 240 F.3d at 993.
>
> In step two, regardless of whether arbitrary and capricious review or the heightened form of that standard of review applies, the court reviews *de novo* the claims administrator's interpretation of the plan to determine whether it is "wrong." *HCA*, 240 F.3d at 993 . . . . If the court determines that the administrator's interpretation is right, the inquiry ends, but if it determines that the interpretation is wrong, the court proceeds to step three. *See id.* at 993-94.
>
> In step three, the court decides whether "the claimant has proposed a reasonable interpretation of the plan." *HCA*, 240 F.3d at 994 (internal quotation marks omitted). If the court concludes that he has, it continues on to step four. In step four, the court must "determine whether the claims administrator's wrong interpretation is nonetheless reasonable." *Id.* If it is reasonable, then the "interpretation is entitled to deference even though the claimant's interpretation is also reasonable," and the court moves to step five. *Id.*

Finally, in step five, the court must consider the self-interest of the administrator. *HCA*, 240 F.3d at 994. "If no conflict of interest exists, then only arbitrary and capricious review applies and the claims administrator's wrong but reasonable decision will not be found arbitrary and capricious." *Id.* The inquiry ends at that point. *Id.* If a conflict does exist, then heightened arbitrary and capricious review applies. *Id.* "[T]he burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest." *Id.* The claims administrator must show that "its wrong but reasonable interpretation of the plan benefits the class of participants and beneficiaries." *Id.* at 994-95. Even if the administrator satisfies this burden, the insured may still be entitled to benefits "if he can show by other measures that the administrator's decisions was arbitrary and capricious." *Id.* at 995.

*Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232 (11th Cir. 2006).[1]

In a case in which the court found that the claims administrator was not appropriately delegated discretion and, thus, the *de novo* standard described in step one of *Tippitt* applied, the Court found that "'a district court conducting a *de novo* review of an Administrator's benefits determination is not limited to the facts available to the Administrator at the time of the determination,' but instead can consider evidence regarding an individual's disability which was in existence at the time the plan administrator's decision was made, even though this evidence was not made available to the administrator." *Anderson v. Unum Life Ins. Co. of Am.*, 414 F. Supp. 2d 1079, 1100 (M.D. Ala. 2006) (quoting *Kirwan v. Marriot Corp.*, 10 F.3d 784, 789 (11th Cir. 1994)); *see also Moon v. American Home Assur. Co.*, 888 F.2d 86, 89 (11th Cir. 1989)

---

[1] Upon a review of the case law, it appears that the multi-step test has been described, at times, differently, for example, sometimes having a different number of steps and sometimes a different first step. Compare, for example, *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010), with *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232 (11th Cir. 2006). The undersigned believes that the multi-step test as articulated in *Tippitt* is controlling upon this case. The undersigned notes that *Tippitt* articulates two reviews utilizing a *de novo* standard: at step one, a review involving cases to be decided entirely under the *de novo* standard as articulated in *Firestone*; and at step two, a review involving cases in which the arbitrary and capricious standard ultimately applies, but concerning which there is a first a *de novo* review of the administrator's decision limited to a consideration of the record before the administrator. As will be discussed, this case involves the former standard.

("[C]ontention that a court conducting a de novo review must examine only such facts as were available to the plan administrator at the time of the benefits denial is contrary to the concept of a de novo review.").

## III.    DISCUSSION

Plaintiff argues that 1) *de novo* review is the appropriate standard of review, 2) Liberty's decision to terminate her benefits was wrong, and 3) she did not receive a full and fair review as required by 29 U.S.C. § 1133. Doc. 45, at 19-35. Red Cross agrees that *de novo* review applies but asserts that Liberty's decision to terminate the LTD benefits was not wrong because Plaintiff failed to "provide[] sufficient evidence to Liberty as of [the date of the final decision] to demonstrate that she was unable to work at any profession" and because Liberty had sufficient evidence to conclude as it did. Doc. 44, at 1.

### a.    *De Novo* Review and the Terms of the Plan

The parties agree that *de novo* review applies, rather than review under the "arbitrary and capricious" standard, which would be the usual standard of review in a case such as this. Normally, to determine whether a plan administrator's determination is subject to *de novo* or "arbitrary and capricious" review, this Court would "examin[e] the plan documents to determine whether they grant the administrator discretion . . . ." *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232 (11th Cir. 2006). However, Red Cross concedes that it failed to delegate discretionary authority to Liberty. Doc. 44, at 7. Accordingly, upon consideration of the first step articulated in *Tippitt*, the undersigned will conduct a *de novo* review as contemplated in *Firestone* and will not proceed to the remaining steps in the multi-step analysis set out by the Circuit. *See Tippitt*, 457 F.3d at 1232 ("If the court finds that the documents do not grant the administrator discretion, it

applies *de novo* review to the administrator's benefits determination and does not proceed to the remaining steps.").

The district court looks to the terms of the plan in deciding whether the administrator's decision was *de novo* wrong. *See* 29 U.S.C. § 1132(a)(1)(B); *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 112-13 (1989) (stating that, under *de novo* review, the court should review the claim "by looking to the terms of the plan and other manifestations of the parties' intent"). Here, the Plan provides that the term "Total Disability" after the first twenty-four (24) month period of total disability means: "not able, solely because of injury or disease, to work at any reasonable occupation." Doc. 45 Ex. B2, at 2. "Any reasonable occupation" is described as "any gainful activity for which you are, or may reasonably become, fitted by education, training or experience." Doc. 45 Ex. B2,at 2. Importantly, the "period of total disability" will end upon, *inter alia*, "[t]he date you are not totally disabled" or "[t]he date you fail to give proof that you are still totally disabled." Doc. 45 Ex. B2, at 3.

### b. Whether Liberty's Decision Was Wrong

Plaintiff claims that her medical records, which document long-term treatment of degenerative conditions, are supportive of a finding of total disability. Doc. 45, at 20-25. Further, she argues that medical evidence obtained after the date of Liberty's final decision is proof of her continued total disability. Doc. 45, at 26-29. Red Cross argues that the evidence provided by Drs. Jaffe, Lefkowitz, and McPhee are un-rebutted and, therefore, sufficient to support a finding that Plaintiff was not totally disabled. Doc. 44, at 8.

### i. Evidence Available to Liberty at Date of Determination

Plaintiff claims that her medical records are sufficient to "confirm her ongoing treatment and disability" because "[a]t no point in her medical history do her doctors state that [Plaintiff] has

been cured of her degenerative medical conditions or is on the road to recovery." Doc. 45, at 25. However, according to the Plan, Plaintiff's eligibility for LTD benefits terminates "on the first to occur of: [t]he date you are not totally disabled . . . . [or] [t]he date you fail to give proof that you are *still* totally disabled." Doc. 45 Ex. A, at 37 (emphasis added). Thus, rather than require Liberty to prove that Plaintiff's condition improved, the plan required Plaintiff to prove that she was *still* unable to work at "any reasonable occupation."

On March 6, 2017, Liberty notified Plaintiff that, in reviewing her eligibility, it had requested medical records from Drs. Shah and Raguindin. R. 211. In addition, Liberty requested that Plaintiff provide it with "treatment notes, test results, operative reports, prescription histories, and treatment plans from March 1, 2016 through the present from Dr. Shah and Dr. Raguidin [sic]." R. 211. Liberty requested that these documents be provided before April 4, 2017. R. 211. Thus, Liberty provided Plaintiff with an opportunity to supplement the records from her visits with Drs. Shah and Raguindin with any evidence that would support a finding that she was still totally disabled as of April 4, 2017. Plaintiff did not provide Liberty with any additional records.

Drs. Raguindin and Shah treated Plaintiff during 2015 and 2016. R. 188-97; Doc. 45 Ex. G, at 1-19. Each treating physician noted Plaintiff suffered from low back pain, degenerative conditions, and generalized pain and tenderness. R. 188-97; Doc. 45 Ex. G, at 1-19. While Dr. Raguindin noted that Plaintiff "needs re-eval from occupational medicine," neither Dr. Raguindin nor Dr. Shah opined as to Plaintiff's functional capacity in their treatment notes. R. 433. Reviewing physician Jaffe, however, spoke with Dr. Shah and they agreed that "there is no evidence of functional impairment and, thus, no supported restrictions or limitations from an internal medicine perspective as well as specifically with the claimant's low back pain." R. 157-58. Indeed, because

Plaintiff failed to provide any evidence to support a finding of total disability as of the initial determination, Liberty was not wrong to terminate her benefits on April 3, 2017.

On appeal, Plaintiff submitted additional records, including: Parrish Medical Center medical records from September 2013 through April 20, 2016; Spine, Orthopedics and Rehabilitation medical records dated April 26, 2016; medical records from Dr. Bharat Patel dated October 2014 through December 2014; a letter from Dr. Shah dated May 12, 2017; and S&A Acupuncture records dated October 8, 2013 through May 12, 2015. Indeed, these records display that Plaintiff suffered pain through her back and legs and exhibited decreased range of motion. R. 74, 82, 87, 91, 95. In light of these documents, Dr. Shah stated "I feel that this patient may not be able to work." R. 154. However, Dr. Shah later discussed the specific restrictions and limitations upon Plaintiff's ability to work with Dr. McPhee and agreed that she had at least some functional capacity from April 4, 2017 through August 31, 2017, the date that they discussed her medical history. R. 42.

Further, the undersigned considers the findings of the reviewing physicians, Drs. McPhee and Lefkowitz, persuasive evidence that Plaintiff was not totally disabled. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) ("Nothing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians."). Dr. McPhee reviewed all of the medical and non-medical evidence provided by Plaintiff during the course of the appeal, as well as the evidence maintained by Liberty since 2006. R. 45-53. Dr. McPhee determined that, "[a]lthough the claimant reported 80% to 95% overall improvement with injection at her [doctor] visit on 12/17/14 and she does not have focal neurological deficits, her marked spinal degenerative disc [sic] and facet joint disease and comorbid obesity support functional impairment from 4/4/17 to the present." R. 44. He identified her restrictions and limitations as

follows: "sitting frequently with the ability to change positions briefly as needed for comfort, standing/walking occasionally, lifting 20 pounds occasionally and 10 pounds frequently, carrying 10 pounds occasionally, bending/stooping/twisting occasionally, squatting occasionally, climbing stairs occasionally, and crawling/climbing ladders never." R. 45. Notably, Dr. McPhee spoke with Dr. Shah on August 28, 2017. R. 53. Again, treating physician Shah agreed with a finding of functional impairment, as well as with the restrictions and limitations identified by Dr. McPhee. R. 42; 53. Rather than find total disability, Dr. McPhee found that, "[w]ithin the restrictions and limitations above the [Plaintiff] has sustained capacity to maintain full time capacity of 8 hours a day/5 days a week." R. 56.

Consulting physician Lefkowitz also issued a report on Plaintiff's functional capacity. R. 35-38. Dr. Lefkowitz also relied upon medical records dating back to 2005 in issuing his report. R. 37-38. He found that Plaintiff suffered functional impairment due to low back pain, neck pain, and morbid obesity. R. 35. Although Dr. Shah declined to offer an opinion to Dr. Lefkowitz as to whether Plaintiff had the ability to "work for 8 hours a day/5 days per week," Dr. Lefkowitz agreed with Dr. McPhee in finding restrictions and limitations that include "frequent sitting, occasional walking/standing, occasional lifting up to 20 pounds, frequent lifting up to 10 pounds, occasional carrying up to 10 pounds, occasional bending/twisting/stooping/squatting and stair climbing, [and] no climbing ladders." R. 29, 36. In his opinion, Plaintiff's "available medical records support the ability to perform sustained activities within [the specified restrictions and limitations] for 8 hours per day, 5 days per week." R. 36.

Finally, Vocational Case Manager Nicole Hall reviewed Plaintiff's medical records and performed a transferable skills analysis. R. 24-27. She concluded, based on the restrictions and

limitations provided by Dr. Lefkowitz, as well as Plaintiff's history of "work, education, training and/or life experience," that Plaintiff was able to perform a number of occupations. R. 24-26.

In sum, the treatment notes from Dr. Shah, as well as the reports provided by Dr. Jaffe, Dr. McPhee, Dr. Lefkowitz, and Vocational Case Manager Hall, support a finding that Plaintiff was not still totally disabled.

Plaintiff argues that her long-term treatment for degenerative conditions, which is supported by objective evidence, is sufficient to find her totally disabled. R. 20-25. Indeed, the objective evidence dating back to 2005 details a long history of chronic pain. However, the undersigned must consider whether, at the time of Liberty's review, Plaintiff was *still* unable to perform the work of any reasonable occupation. *See Kimber v. Thiokol*, 196 F.3d 1092, 1098 (10th Cir. 1999) ("[O]ne-time determination of eligibility for benefits under [a plan that terminates upon the failure to provide medical evidence of disability] does not foreclose subsequent principled review. The Plan itself contemplated the ongoing review of all disability claims."). As discussed, the evidence before the undersigned supports an ability to perform the work of multiple occupations. R. 24-26.

Further, Plaintiff argues that, because Plaintiff "was required to submit continued proof of disability" and "was paid LTD benefits for nearly twelve years," her "medical records and claims administrators' reviews must have confirmed and supported her continued disability." Doc. 45, at 17. However, Plaintiff does not provide detail as to what the medical records contain that would prove that she is totally disabled. Rather, she concludes that the undersigned should "infer that the medical reviews by Aetna and the FCE report were supportive of Ms. Smith's disability because . . . Aetna continued paying Ms. Smith's LTD benefits." Doc. 45, at 17. The undersigned finds this speculative and unsupportive of a finding of total disability as of Liberty's final date of

determination. Further, Plaintiff bore the burden to prove that she was totally disabled under the plan and failed to do so. Thus, Liberty's decision was not wrong.

### ii.   Evidence After the Date of Liberty's Final Determination

Plaintiff submitted evidence of disability to Liberty after Liberty made its final decision to terminate Plaintiff's LTD benefits on September 21, 2017. This evidence consisted of treatment notes from visits with Dr. Raguindin and Dr. Allota, including a FCE. The treatment notes from Plaintiff's continued visits with Dr. Raguindin note that she relies on her scooter and cane for mobility. Doc. 45 Ex. H, at 21. They also state that she "continues to have chronic debilitating pain and would likely not improve due to underlying morbid obesity . . . [and] patient is unable to get gainful employment due to this [disability]."  Doc. 45 Ex. H, at 5. Dr. Allota's treatment notes from late 2017 and 2018 note that Plaintiff continues to complain of tenderness and exhibits decreased range of motion. Doc. 45 Ex. I, at 1-20. Notably, Plaintiff submitted to a FCE in August 2018 that lists more restrictive functional impairments than those noted by the vocational expert in September 2017.

The undersigned does not find this evidence supportive of a finding of total disability as of September 21, 2017, the date of Liberty's final decision. Dr. Raguindin's notes, Dr. Allota's notes, and the FCE were not in existence during the time of Liberty's review. *See Anderson v. Unum Life Ins. Co. of Am.*, 414 F. Supp. 2d 1079, 1100 (M.D. Ala. 2006) ("'[A] district court conducting a *de novo* review of an Administrator's benefits determination is not limited to the facts available to the Administrator at the time of the determination,' but instead can consider evidence regarding an individual's disability which was in existence at the time the plan administrator's decision was made, even though this evidence was not made available to the administrator.") (quoting *Kirwan v. Marriot Corp.*, 10 F.3d 784, 789 (11th Cir. 1994)). Although the undersigned may consider

evidence outside the administrative record while conducting this *de novo* review, it will not consider evidence that was not in existence during the administrator's review.

Even if the undersigned were to consider the treatment notes from visits with Dr. Allota and Dr. Raguindin through June 2018, those records do not describe any level of functional impairment greater than the restrictions and limitations already determined by the treating physicians, the reviewing physicians, and the vocational expert. "[D]iminished strength, decreased range of motion," and "tenderness" were each noted by the treating and reviewing physicians during Liberty's review of Plaintiff's claim.

Further, the treatment notes and FCE do not reflect Plaintiff's disability status as of September 21, 2017. Dr. Raguindin's notes from July 3, 2018, as well as the FCE that was completed on August 7, 2018, may provide evidence that supports a finding that Plaintiff was totally disabled on those dates. However, between September 21, 2017 and those dates, Plaintiff visited Dr. Raguindin on several occasions as a result of at least four falls in November 2017. Doc. 45 Ex. H, at 14, 29. The effect of the injuries from her falls on her functional capacity is unclear. As a result, the treatment notes from July 2018 and the FCE from August 2018 may not accurately reflect Plaintiff's disability status as of the final date of Liberty's decision.

Regardless, the Plan is clear that the date on which a claimant fails to be totally disabled or fails to give proof of total disability is the date that the claimant's disability benefits terminate. Doc. 45 Ex. A, at 3. Here, the date that Plaintiff failed to provide proof of total disability was the date of Liberty's final decision, September 21, 2017. Thus, per the terms of the Plan, Plaintiff's eligibility for LTD benefits ended on the date it failed to provide proof of total disability.

### c.  Whether Plaintiff Received a Full and Fair Review

To the extent Plaintiff argues that Red Cross "*could not have* conducted full and fair reviews [of Plaintiff's disability termination] when their reviews were based on an incomplete record," Plaintiff's argument must fail. "If benefits are denied, section 1133 requires the plan administrator, '[i]n accordance with regulations of the Secretary,' to provide a 'full and fair review . . . of the decision denying the claim.' *Id.* § 1133. The administrator must '[p]rovide . . . upon request . . . all documents, records, and other information relevant to the claimant's claim for benefits' for the review to qualify as a 'full and fair review.' 29 C.F.R. § 2560.503-1(h)(2)(iv)." *See Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245 (11th Cir. 2008).

Thus, upon Liberty's initial decision to terminate Plaintiff's LTD benefits on April 3, 2017, Plaintiff was entitled to a "full and fair review" of that decision. On June 14, 2017, Plaintiff submitted a written request for an appeal that included additional documentation for Liberty's consideration. However, because Plaintiff did not request documents, records, and other information that was relevant to her claim for benefits, Liberty was not required to provide her with any documentation.

Although she did not request to review the relevant documentation considered during Liberty's initial determination, Plaintiff did request and receive a "full and fair review" that took "into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." Drs. McPhee and Lefkowitz, independent reviewing physicians, each conducted reviews of Plaintiff's claim file and reviewed the additional information submitted by Plaintiff. According to Dr. McPhee's report, the records considered during his review were maintained in "Liberty Mutual System One" and the records considered by each physician date

back to 2005. R. 37-38, 45-53. Plan administrators are not "under any duty to secure evidence supporting a claim for disability benefits when those trustees had in their possession reliable evidence that a claimant was not, in fact, disabled." *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir. 1985); *see also Bloom v. Hartford Life and Acc. Ins. Co.*, 558 Fed. App'x 854, 856 (11th Cir. 2014) (holding that, where the record provides strong support for the administrator's decision, the administrator is not required to "seek out the location of and consider omitted documents referred to in the record"). The reviewing physicians examined all of the documents that were submitted by Plaintiff, including an extensive list of medical records dating back more than a decade. They had no obligation to search out additional records, especially because there was reliable evidence that supported a finding that Plaintiff was not totally disabled. Further, Plaintiff had multiple opportunities to provide Liberty with "additional information" and "all medical records pertinent to [her] disability" after Liberty's initial determination but failed to provide any that proved she was totally disabled. R. 72; R. 212. Thus, Plaintiff was provided a "full and fair review."

In light of the foregoing, the undersigned concludes that Liberty's decision to terminate Plaintiff's LTD benefits was not wrong and Plaintiff was provided a "full and fair review." Therefore, the undersigned respectfully recommends that Defendant is entitled to summary judgment.

## IV.     CONCLUSION

Accordingly, it is respectfully **RECOMMENDED** that:

1.  Defendant's motion for summary judgment (Doc. 44) be **GRANTED**

2.  Plaintiff's motion for summary judgment (Doc. 45) be **DENIED**; and

3.  The Clerk be directed to enter judgment in favor of Defendant and against Plaintiff, and to close the case.

## **NOTICE TO PARTIES**

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on February 21, 2019.

DANIEL C. IRICK
UNITES STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record
Courtroom Deputy